May I proceed, Your Honor? Yes. May it please the Court, Mark Beebe here on behalf of Allied World Insurance Company. Your Honor, the appellant in this matter and the excess follow form insurer under an OSIP, or an owner's construction insurance policy, covering a project known as Nicholson Gateway. Nicholson Gateway development was a project built, a modern lifestyle project, over a million square feet, seven multi-story buildings covering several acres on the campus or near the campus of LSU. It was a public-private partnership between LSU, the LSU Foundation, and Provident Flagship Development Company. Provident, who was the lease, the lessor, or lessee, rather, of the property, hired a company called Rise Tigers to develop this project and ultimately hired Rise Residential, which is separate and apart from Rise Tigers, as its facilities manager. Allied filed suit in July of . . . We know the facts. Thank you, Your Honor. So is your totaling argument that Rise and Provident couldn't have discovered this cause of action? In other words, it wasn't reasonable? Or that they could have, but there was no duty for Rise to learn about it? Well, Your Honor, there's separating the constructive knowledge of Rise from whether they could have discovered it. The issue is when you apply contra non-valentam and you look at the cases and you look at what the district court did and those from Louisiana, there are differences between those which are exceptions of prescription and those which are basically decided under summary judgment, right? And that's the problem is each of the cases you may look at when it's an exception of prescription, that's a trial. There's been evidence. There's been determinations. What the district court did wrong in this particular case, Judge Higginson, was that it usurped the jury's providence. It made credibility determinations. It's generally left to a jury. That's right. But not always. Well, in a reasonableness, let's talk about what the judge relied on in his opinion. He says, one, the most important fact was the writing of Mr. Nichols saying, hey, there's a problem here and there's also . . . This happens in November of 2019, right? He says there's a problem here. And then what do they do? They begin this investigation. Let's fast forward right to Dr. Diddy, Piddy?   Dr. Piddy tells Lemoyne it's boracare. Right. We know that by the end of February. Right. But what . . . Well, we really know it by the end of December of 19, don't we? Do you? When it's only a single, it is a single sample. But you've got Dr. Piddy saying it's mold care, boracare, and I'll run a full test and all that and get back to you, but that's what it is. Right. But that doesn't happen until February. I thought he had a preliminary report back in December of 19. He does. When he looks at that, he does a chemical analysis after the visual analysis, right? And he does a chemical analysis. But he says it's the boracare. Why do we know that? And this is an important fact, right? Dr. Piddy had been hired by NISIS previously, and NISIS in February had it tested. And ultimately, NISIS knew that boracare and mold care was not compatible with the CPVC. So, yes, we'll put that to the side a minute. But NISIS is not who hired Dr. Piddy in November of 2019. That was . . .  Le Moyne. And Le Moyne, what did they do? They say, Ryan Plessla says, I do not want to panic. I want to make certain we gather all the information. Is that reasonable? No, but that's not the way prescription works. You don't get to gather all the information or have the final expert report or anything like that. That's the taxatier case that says you've got to have a basis to go and investigate it. And if you investigate it, where would it pretty much obviously lead? And, Judge, I would point to the Akron Marine case, the Chevron v. Akron Marine case. Think about that case where they have the risers being attached to the bottom of the ocean. And they do notice that two and a half years, almost more than two years, the nut, the top of the bolt, pops off. They send divers down to the bottom of the ocean, and they take a video about a little over a year, a year, maybe a week, before they file suit. So they know that these bolts have all popped off, right? And they're looking for the alternative cause. They're looking to say, oh, wait, is it oceaneering over-torquing them? Right. But I guess same line of inquiry. Maybe that's true around December when it could have been the glue or it could have been the treatment. But by the end of February, months before July, it's conclusive. It's the BoraCare. Well, it's not conclusive until they get the November of 20 report where they take different samples to make certain, from different parts, looking at the treatment from different buildings, right? Not all the buildings had the BoraCare applied on top of the CPVC. I thought by the end of February, Dr. Priddy said, this is what's doing the leaks. One report. Okay. One sample. I'm sorry, one sample, to be honest. So what's your – I mean, at that point, they really have a duty to inquire. They can't sit on the suit. Well, what's happening, too, you have to look at the world at this point in time. COVID is happening. Right. Okay. That would explain why they – I thought that's a separate argument, though, that you can't impute what Lemoyne knew back to Rice. That's not the taxiteer point that Judge Wilson was asking. Right. Well, I think that – well, part of it is the discovery rule, right? Are they on notice? What is the obligations of Rice Residential? Rice Residential never knows, right? That's in Lemoyne. Is Lemoyne's knowledge going to be taxed to Rice Residential? We know Nichols and Savoie told Lemoyne they work for Rice. They told them look into it. So the inaction here, under constructive knowledge, is why didn't they follow up? Part of it is they're waiting for Lemoyne. Is it unreasonable to wait on Lemoyne, who is the general contractor? Is it unreasonable to wait on Lemoyne, who built this million-dollar square feet? Is it unreasonable? But you agree it's unreasonable never to ask about it? Yeah. That's the crux of it. Yeah, that's the crux of it. Well, that is certainly what Judge Jackson found. But it's not unreasonable to wait eight months. If you go back and look again, if you look at the Akermarine case – Maritime case, excuse me. They waited more than a year. They had video evidence. They had to figure out who is responsible, okay, who ultimately is responsible, who should you sue. Because don't forget, the first email is about – and the first notice is about glue. NYSIS is not responsible for the glue. You would have sued someone else. And if you'd sued them, you might have sued the wrong party. Right? I guess I'm sort of stuck back with that taxatier case. It's do you have the potential root cause enough to inquire? So they clearly, when they send the pipe to get looked at, they have a potential root cause. And then, lo and behold, it turns out to be that one, but they just don't ask? Well, part of it is, again, they're waiting on Le Moyne. Look, they rely on Le Moyne to say ultimately what went wrong. Does the record answer who Le Moyne worked for? Who was Le Moyne performing the tests for? Well, what in this particular case, RISE Residential, ultimately says, look, this is a construction issue. We don't think it's something that falls with necessarily our province. You built this place. Please tell us what's going on here. But, again, back to the question. This is an easily answered question. Who's Le Moyne working for to run this test? Who called him and said, hey, could you look at this? RISE Residential raised it to their attention and brought it through RISE Tigers, right, the developer. They raised it to RISE Tigers and Le Moyne. There's a relationship there because they're a facilities manager, but they're saying this is a concern, and rightfully so. But the question is, is eight months too long? Is this unreasonable delay? When you're considering the fact you can look at, we can talk a little bit about what NYSSA's behavior and what they did hiding this, but is it unreasonable? That's the question, and why does the jury not get to hear all of the evidence about what they did? The jury might very well be able to conclude that, look, this behavior, they should have called. This is what the district court ultimately said, is that RISE Residential did not act. They cannot bring this to the edge of discovery and stop. But they're waiting on Le Moyne. Is it unreasonable to wait on Le Moyne? Is it unreasonable that Le Moyne doesn't disclose it because they're concerned, wait, are we going to cause a problem at LSU? Are we going to have to remove all seven buildings worth of pipe? Because ultimately that's not what happened. There's only been two, three buildings that have had pipe removed because if you had gone with Dr. Priddy's report, it would have been let's remove it all. But what we did learn is that BoraCare with mold care is not compatible with CPBC. Didn't the CPBC pipe warning say don't use these things on the CPBC? That's not exactly right from the standpoint of the Spears warning talks about if you have a doubt, then call. And they have a list of saying, and there are some moldicides that are compatible with Spears. It says if you have a doubt, then call the manufacturer of Nisus, call Nisus, the manufacturer of the mold, in this case the moldicide, or call Spears. Again, the key is— Did they call? They did not. And part of it is because when you read Nisus's label, Your Honor, read Nisus's label, and it's in the record. It's very general. So, I mean, I don't know because I'm not a multimillion square foot developer, but you've got this CPBC pipe that says be very careful, no moldicides, no agents, whatever, that are meant for cellulosic material, whatever. And then you've got this general warning or instruction from Nisus. I mean, I don't know. At some level, it's like who to hold responsible for squaring all this. And Le Moyne just went in and sprayed it, right, when they were constructing the buildings. They hired Arrow. Yeah, I mean, it was a subcontractor. And Arrow, of course, reads this. But it says boric care solutions may be used on all non-food contact surface, cellulosic materials including wood, plywood, particle board, paper, oriented strand board, OSB, cardboard, non-food packaging material, wood composite, structural components, concrete block, brick metals, PVC plumbing pipes, and other non-cellulosic materials found in structures. You've made two arguments, it sounds like. One, you're saying, well, maybe there was a duty to follow up, but we had COVID. That's right. I think COVID, that's a circumstance. Just so I can understand, the separate one, it sounds like you're saying, is, well, Nisus misrepresented. They misdirected us. That's right. But that wouldn't be true once you have the lab reports, right? At that point, you know what it is, whatever the representation is. And that's where there's a disagreement about are you certain. You have Dr. Priddy taking one sample. Is that sufficient when you're talking about 16 1⁄2 miles of pipe, 87,000 linear feet, 10,500 sprinkler heads. When you get one sample, he says we believe it to be BoraCare mold care. That argument go counter to what you're saying is they could have waited eight months because they have to stop the damage. They're worried about thousands and thousands of sprinkler heads. So this is a high urgency, and yet all of a sudden after sending the pipe, they just stop? Well, they're waiting on LeMoyne to tell us what's going on. And I think it's reasonable to wait that time to determine because how many more leaks are there? Realize during the warranty period there's five, right? Substantial completions in the summer of 2018, there's only five leaks. There's seven that come up during the period until that November date, right? So you have 12 leaks approximately. Well, but there's enough where the RISE residential folks say this could be a big problem. This could be the glue. This could be a big deal. And the guy that's on site, Nichols, I can't remember his name. Mark Nichols, your honor. He raises the concern. He raises the flag and says this is too many leaks. I mean, at some level, again, and this is right from Taxotere, prescription runs from the time there is notice enough to call for inquiry about a claim, not from the time when the inquiry reveals facts or evidence sufficient to prove the claim. And that's citing other authority. Right. But think about it when you look at the Bruno v. Biomet and also the Pittman case, right, What does it say? What happened in Pittman? This was very interesting. In Pittman, they granted summary judgment. In that same case, and this deals with the wing wall for a pumping station in, I believe it's St. Bernard Parish. But essentially what happened in that case, they had exceptions of prescription for the engineer and the insurer. And then the summary judgment move was moved by Pittman. And what happened, the judge who heard those exceptions granted those exceptions of prescription against the engineer and the insurer. But he also granted summary judgment against the parish on it. And what it was, it was reversed by the Fourth Circuit. Why? He said you were making factual determinations. You're weighing the evidence. You're not allowing the jury to hear this. And that's exactly what happened here. Because somebody gets to Could you just tell me a rule of law answer? If, under Taxotere, you actually do know enough that you initiate an investigation, if that premise is true, what's the case that says you can then not follow up on it? If you make the determination that you believe that ultimately that you have enough knowledge, the question is what do you have to do? You have to weigh the evidence, do you not? Because what is NISIS saying? They already weighed the evidence to start the inquiry under they knew they had to find out. And then they send it. And the lab comes up with the answer. You're saying it's still reasonable for them to never follow up? It's because is one sample sufficient? That's the question. Is one single sample? What's the case that supports that? I think that supports that case of the Chevron v. Akramarine because there is a situation in that particular case. Again, you don't know the cause or who to sue, right? Because Oceaneering is the one who tightens the bolts perhaps too hard. The one who delivers the bolts, which was Lone Star. Lone Star says, okay, maybe we delivered the wrong bolts. And you're trying to figure out who to sue. And they wait. They basically start their own investigation and file suit 11 months after investigation, not eight months. Right. But that's different. That's more analogous to November of 2019 when it could have been the glue. And what we find out is, is it enough to have one sample? Because don't forget, NISIS says we don't even know if it's been applied. We don't even know. And we don't believe Boracare would work here. They're stressing the one sample is insufficient. They should have sent them more. It's not COVID. It is COVID at that time because don't forget, COVID starts to creep in in December of 20. I mean 19, excuse me. And then really takes off in that. You travel a lot in your briefing on the scope of the agency between Rise Residential and Provident. Yes, sir. But if that agency includes Providence leaks and leak detection and all that sort of thing, you lose on that point, don't you? Arguably. But here's the issue is because when they have Le Moyne look at this and it's a construction issue, and we maybe tried to slice that too thinly, but the idea is, again, is it reasonable? Was their actions reasonable given all the circumstances to wait until Le Moyne finally reported? Because Realize Providence certainly doesn't know. And the court correctly found that Provident had no actual art constructive knowledge. Where's the evidence that they were waiting until Providence, I'm sorry, Le Moyne finally reported? Well, they have the e-mail that comes in from Byron Bernard who says, hey, we're going to have a meeting once Le Moyne gets the information. And if you read Ryan Plessla's deposition, the site, I think it's footnote 11 in our original brief, he says, hey, we don't want to jump the gun. We want to take our time. We ultimately want to make a determination and get that information. It's not as though you have to have every detail. But when you have one sample, that's not enough. It's not sufficient. And that's what the jury should get to hear. A jury should be able to weigh that evidence. And in this case, the district court weighed that evidence and made a credibility call about the reasonableness and ultimately made a factual determination which goes to the merits. I'll save the remainder of my time for the rebuttal. Thank you. Thank you, counsel. Mr. Aikin. Yes, Your Honor. May it please the Court. Gregory Aikok on behalf of the appellee NYSIS Corporation. The district court properly granted summary judgment because under Louisiana law, Allied's claims were prescribed at the time suit was filed and Allied was not entitled to toll prescription under the contra non-valentum doctrine. Do you agree there's nothing in the record that says rise new, rise new actually by July 20? So we're just looking at a constructive knowledge case? Oh, that rise residential new?  Oh, rise residential. They knew it was this Bora care thing. They did not find out the Bora care because it was never told to them and they did not follow up. So our questions to opposing counsel were accurate. This is an inaction case. Yes, it is, Your Honor. Okay. It's an inaction case. There's no evidence that they knew or Provident knew. The evidence stops at Lemoyne. And the mystery is why didn't Lemoyne tell rise or rise ask Lemoyne? That's correct. Yes, Your Honor. And as of December 11, 2019, when Mr. Bernard told him we'll get together with Lemoyne and we'll meet to talk. Rise residential just fell off the face of the earth and didn't do anything further because up until that point, they were tracking the leaks and they did everything and they just stopped. I thought in your brief you were saying actually they knew already back in August, November of 2019. But you're not pressing that. Is that correct? Because at that point, they really didn't know if it was glue or the other. And the last thing we want to do is force them to sue people that aren't defendants under a cause of action that isn't correct. Well, what rise residential knew based on Mr. Nichols' testimony and his incident reports and other matters that he filed, he mentioned that there were environmental stress cracks in the leaks and things like that. So he knew there were issues with the glue and the pipes at that point. They just didn't fail to do anything. Yeah, but you're not saying they had to sue the glue manufacturer. The whole point is you don't have to sue until you have some knowledge of the actual defendant.  That's correct. And they had, well, they had enough under the law on contra non-valentum. They had enough excitement to excite their attention in order that prescription began running. And that happened not only when they were documenting all the leaks, when they were investigating, but you had these parties together talking about these issues at that point. So I believe not only was rise residential on notice, you also had Lemoyne on notice as well as rise tigers. And this even goes back during the warranty period because I know he mentioned five warranty leaks. However, there were ten total warranty leaks in the, during that period. And those, and those were tracked by Doster. Lemoyne also kept a track of Doster's leaks. And then on March 15th of 2019, there was an email from Mr. Nichols. He wrote a Ms. Karen Rocket at LSU as well as Ms. Savoy telling him about a leak in the Delta building. And at that point he said, Lemoyne's coming over. They're going to put a garbage can under it. And then we're going to start doing something with this leak. So then. Again, how much do you have to know? I mean, glue problem, installation problem, defective manufacture of the PVC pipe or mold care. I mean, how much do you have to know in terms of whom to sue? I don't, I think the law is you don't have to know the exact party as long as your attention is excited. And you have, and they knew the pipe manufacturer. They could have easily sued the pipe manufacturer. And what's interesting about the pipe manufacturer is Spears Manufacturing, the defendant in this case. That phrase, attention excited, is a pretty vague one. Right? Why, isn't that encouraging just to sue everyone, the glue manufacturer, before you really know? Yeah. No, I think you, so you don't have, they have to file, they would file the suit. They knew the pipe. There was issues with the pipe. And what's interesting about this case. Maybe, I'll ask it. I'm interrupting just for time. Yes. Can you speak to the case that he really emphasized, Amazon, Amazon Aquamarine, or Chevron versus Amazon Aquamarine? Yeah, I don't believe that's applicable. I think, you know, here what I think is more applicable would be. Remind me what happened and why it's not applicable. He talked about the bolts and things like that. And I just don't believe that that. Do you remember that case or not? I don't. I remember reading it briefly, but that was a while ago. You can't really. I can't really, really say. What I think was more applicable here is Taxotere, also the Marin property case as well. The Louisiana Supreme Court found that contra non-valentum did not apply to prevent accrual of a plaintiff's claim against Exxon, where a plaintiff's acquired knowledge of their potential claim years in advance in the suit. And back here, it's interesting. Le Moyne is the general contractor in this matter. And while this construction of the Nicholson Gateway was going on, on July 10th, 2018, Le Moyne had filed a product liability case against the same pipe manufacturer, in this case Spears Manufacturing, for the construction of a building in downtown Baton Rouge 3.1 miles away. So they had knowledge of incompatibility. So Le Moyne knew there were issues with the glue and the pipe. They knew about incompatibility. Le Moyne could have easily filed a product liability case. But that's getting pretty attenuated from Providence and from the RISE entities. What about counsel opposite's point that RISE was waiting on Le Moyne to get back to it? The final say from Le Moyne, and therefore the seven months passed. The pandemic is happening. I mean, how long is it reasonable to wait on something more definitive? Your Honor, I don't think it's reasonable at all to wait under the law. On December 16th. That can't be right, can it? I'm sorry. Because I just want to be sure we're talking about who we're waiting on. Because you say RISE was waiting on Le Moyne. But there's some argument, I think, that Le Moyne had some affirmative duty to act. Or is that not part of the argument? RISE Residential was the agent of Providence here, based on the facilities and operation and maintenance agreement. And there are two sections of the FOA that set forth their agency duties. So they had a duty to follow up and report back.  Yes, sir. But they're basically running a dorm. They have a duty to look into structural repairs? They were managing and facilitating the dorm, the repairs. And what they were doing is documenting the leaks. And under Section 3.5 of the FOA, they were required to fill out what's called an incident report. And Mr. Nichols did exactly that in this case. Where he filled out a very detailed incident report in December of 2019. Talking about there was another leak. We had environmental stress cracks and things like that. So they were doing their diligence as well under the law. And you're not making any argument that Le Moyne had any obligation to do anything more than what he did? No, we believe Le Moyne did have an obligation. Because under 2.3 of the facilities and maintenance operation agreement, that is the outsourcing provision. And that allowed RISE Residential, as a facility manager, to outsource to third parties if it wanted to. And that's exactly what RISE Residential did. But they had to have written approval. Is that in the record? It is in the record. It's in the FOA that they need a written approval. Oh, I know. But is that approval in the record? No, sir. We don't have the written approval. However, it's interesting because RISE Residential tasked RISE. Tiger is the developer to get on board to investigate. And they believe there was something going on because of the number of leaks. And then they also got Le Moyne involved. And so Le Moyne is working, communicating. They're all communicating at one point. What's wrong with this line of thinking? I'm RISE Residential. I'm running a dorm. And I see a leak. I've got to repair the leak. I've got to document the leak. But I went above and beyond to say, hey, Le Moyne, could you sort of figure this out? But I've got no duty to tell Provident anything. It's not in my agreement with them. I think under the FOA, it is the duty of RISE Residential to inform Provident. Without written approval, they had to investigate and get an answer to the structural problem. I think RISE Residential had a duty to at least inform its principal, hey, here are the issues going on. This is what's happening. Here's a summary. Not to mention, under the FOA, RISE Residential is actually paying for the repairs of the leaks from Provident's checking account. Okay, I was curious about that. They're paying for the repairs. Who's paying Le Moyne? Who paid Le Moyne? Le Moyne entered into a contract, was hired by RISE Tigers. And RISE Tigers is the developer of this project. But who is paying Le Moyne to do the analysis work that's happening in December 19 through February 20? Le Moyne is doing this on their own. Because eventually, when this came back and these repairs were made starting in the summers of 2021, Le Moyne used a different entity to do these repairs. So Le Moyne was paying for their own investigative work to have Dr. Priddy do the reports. And I'd like to go back to Dr. Priddy as well. As of December 16, 2019, Dr. Priddy sent an email to Le Moyne's investigative team. To Mr. Hoffman, Mr. Mike Le Moyne, and Mr. Ryan Plessla. And he told them, it is the Boar Care with Mole Care, and I recommend that you use this product before, and he capitalized before, you install anything in the building. And then again, he came back February 5th, and he did. It's interesting because his February 5th report is entitled, It is a Root Cause Report. And that's the same thing that Mr. Nichols said, is we need to get to the root cause. So as of February 5th, Le Moyne knew the issue with that. Briefly. The district court correctly determined that Rye's residential had actual, and at a minimum, constructive knowledge of the damage one year prior to suit being filed. And that knowledge of damages was imputed to Provident, thereby terminating Allied's ability to advance the contra-non-valent defense. And the district court correctly held there was no dispute that an agency relationship existed between Rye's residential and Provident because of the FOMA that we discussed. And it's a basic tentative agency law that knowledge of, or notice to an agent, is imputed to the principal when it is received by the agent while acting within the course and scope of the agent's duties. When does NISA say prescription started? November 20th of 2019, and that is the day when you see the history of all the emails where Mr. Nichols started sending emails to everyone saying we found another leak. That's the initial emails to Nichols, to Savoy, and it sort of got elevated? Yes, sir, it got elevated. However, you can almost believe, think prescription even started soon. We believe November 20th is the date, and that it prescribed on November 20th of 2019. However, if you look at the history of the 10 warranty leaks, there were 11 leaks in between August 9th of 2019 and December 20th. And I believe those 11 leaks were spread out over four or five buildings. So you're starting to see, and the warranty leaks were in four buildings. So you're starting to see a systemic problem at that point. And you've got Rye's residential, you have Mr. Nichols developing a leak list. He's documenting the leaks when they're repaired, they're being paid by Provident. And that is that Mr. Nichols' leak list can be found at 41, 48, and then I believe 48, 40, 77, and 40, 78. But that is an Excel spreadsheet, it's a two-page leak list that shows how he documented the leaks. And those leaks, again, from August 19th through December 18th were in five buildings. You had two leaks in the Gulf building, five in Delta, two in Marsh, one in Oxbow, and one in Canal. And then he was also taking photographs. And there's testimony in the record where he was storing the pipes in his office and told people if they wanted to review them, they could come in to do so. So based upon Rye's residentials, all the investigative work that they were doing, they clearly had actual knowledge of the damage to the sprinkler system. Wait, I'm sorry. Who had actual knowledge? Rye's residential. I thought we agreed at the beginning they actually never had actual knowledge. The case is one of constructive knowledge. Well, they had actual knowledge that there's something going on. There's leaks. There's something going on. Yes, there's something going on. I mean, sometimes maybe we have to blame ourselves. When I look at Taxotere and now, thanks to the miracle of Westlaw, I'm looking at the Chevron case, Taxotere sort of is the excite the attention to inquire. The clock starts running when you should start asking. But I look at Chevron, it seems to be saying, no, it's when you know to inquire about a specific defendant. Is there that uncertainty in our law taking the eerie guess on Louisiana law? No, Your Honor. I believe it's when you have enough attention and you're on notice of a claim that you have a potential claim. There is a problem. There is a problem that that is enough that the time period starts running. Why doesn't that mean sue everyone that could conceivably have the cause of the problem? Well, because you have an issue with the pipe, the glue, the cracks in the pipe. They knew who the pipe manufacturer was. But in addition, LeMoyne knew Boracay with Morcay was used by December 6th. Well, they actually sent the Boracay information to Dr. Priddy. Dr. Priddy tells them in December of 2019 and again in February 15th. They knew at that point, regardless. Let me stop there again. Yes, sir. Dr. Priddy tells when you say them. Dr. Priddy only told LeMoyne. LeMoyne, yes, Your Honor. And LeMoyne never tells Rice. LeMoyne didn't tell Rice and that was not done until later on, months down the road or whatever I believe. Within the, it would not be prescribed. They. It required actual knowledge. Well. In the constructive knowledge case. They told, I believe in the summer, there was a meeting at LSU. But that's when Rice found out. But at that point, you've got all these individuals and all these companies investigating the leaks. And at that point, not only. Was that meeting before or after July 30th? I believe that meeting was before July 30th. But it was the end of July. I can't give you the exact date. But I'm sure, I believe it's at the end of July. Okay. And the critical moment is July 30th, right? No, sir. I believe the critical moment is, the critical moment is the fact that Rice Residential, their constructive knowledge is. When was the lawsuit filed? The lawsuit was filed July 23rd of 2021.  So, I just work back from that. Yes, sir. But the critical moment is, Rice Residential was on. Their failure to follow up or notify Provident of the persistent damage and investigation constitute a lack of diligence on their part. I know. I just got a little confused with your answer. Maybe me. I thought you were saying, oh, well, it doesn't all matter. Because they actually knew in early July. Well. They actually knew. But. Not so. In Rice Residential, they didn't act reasonably under the law when they became aware of the persistent leaks. They were on constructive notice before July 23rd of 2020. And they were on notice of everything but Dr. Priddy's lab reports. And so, during that time, they failed to notify Provident. The district court correctly determined that Rice didn't act reasonably once it became aware of the persistent leaks. Especially considering during that time frame, Rice Residential, being Provident's agent, failed to notify Provident or follow up on the cause of the damage. I'd like to take you now. Mr. Allied's counsel discussed the label. And what I'd like to do is just address the label. The document they referred to. This product is called Boar Care with Mole Care. It is a co-pack. If you buy this product, it is a co-pack. So, it's a bottle. It's a green bottle with Boar Care solution on the bottom and the Mole Care solution on the top. And what Allied referred this court to is one page of the label from the Boar Care. But these products have to be mixed. And it's an EPA approved label. And you have to use the most restrictive label, which would be the Mole Care label. And so, the Mole Care label, it is a wood product. And so, it should have been applied to the wood. And then finally, I'd like to address. So, the mole part is the corrosive part if it touches a pipe? The insect Boar Care thing doesn't do anything to a pipe? The insect part or the Mole Care part? That's getting into really scientific technical. And we did have a lot of scientific technical. Yes, Your Honor. And finally, Your Honor, I'd like to address. Because the standard of review for this court is de novo, this court may affirm summary judgment on any basis supported by the record, even if it's not reached by the district court. And although the district court disagreed, NISIS respectfully submits that the record demonstrates that Provident itself had actual and constructive knowledge of the leaks, sufficient to start the prescriptive period by August 9th of 2019, and certainly no later than November 16th, independent of all its agents, because Provident had been repeatedly notified about and was paying for the repair of these sprinkle leaks in these buildings. That is premised totally on the check registers? That's on the check registers, Your Honor. Yes, Your Honor. And there's also a copy of a check. The first leak on August 9th of 2019 was in the Gulf Building 3025. I believe. And shortly thereafter, there was an invoice submitted to Nicholson Gateway. And then Mr. Nichols and Rise Residential used Provident's checkbook and paid for that leak. And all of those documents are outlined in the record that clearly show the check was written on behalf of Provident to pay for these leaks. And then Ms. Savoy also testified. We showed her, I believe, 32 different invoices during her deposition of various leaks throughout the building. And she also testified that Rise Residential would have received those or paid for those out of the account. And that, again, is due through the FOMA that Rise Residential, Section 3.1, they had a duty to provide a copy of the check register every month as well as quarterly to them as well. So Rise was sending that to Provident. Your Honor, NYSA submits a district court correctly found that the agency relationship exists between Rise and Provident under the FOMA and that Rise's constructive knowledge of the damage more than one year prior to suit being filed was imputed to Provident, thereby terminating Allied's ability to advance a contra non-valentum defense, thus correctly dismissing Allied's claim as prescribed. Contra non-valentum is also inapplicable here because the record demonstrates that Provident itself had actual and constructive knowledge based on those payments we just discussed. And I'm happy to entertain any additional questions in the minute I have left, but if not, Your Honor, NYSA respectfully prays that the court affirm the district court and dismiss Allied's case because it is prescribed. Thank you, Counsel. Thank you. Rebuttal. Vote. Judge Wilson, you had mentioned text here and I want to talk a little bit about that because it's very important. That case, of course, recognizes the evidence should be construed most favorably to the plaintiff in this particular case, but more importantly, the question with the court asks, it says, ultimately under contra non-valentum, we examine the record for a degree of clarity as to when such a point in time was reached where the plaintiff's information or their knowledge would be sufficient to trigger the running of the prescription or contra non-valentum. And the court concluded that a reasonable inquiry would have uncovered at least some information that linked taxotere to persistent alopecia. And the reason is because, don't forget, this is six years after she had the operation. She loses her hair almost immediately after she begins taking the drug, right? And six years later, and they said the label disclosed that this hair loss was a potential. She does talk to her doctor, and yet she delayed six years, six years after she begins ingesting taxotere. That's the difference in this particular case. What do we know about NYSIS? NYSIS says it's compatible. Their product, BoraCare with MoldCare, is compatible with all cellulosic materials, which is wood, building materials, and all non-cellulosic materials, including PVC. It doesn't say exclude CPVC. So what you have is their MoldCare is compatible with all materials. If they're cellulosic and non-cellulosic, what else is there? So we rely on that representation. That goes into the mix of information that the judge ultimately made a credibility call and made a call on the merits. Well, but now that I've had a chance to peek again at Chevron, but you cited it, so it's my mistake. We were really clear the prestrictive theory does not begin to run until you have a reasonable basis to pursue a claim against a specific defendant. That's correct. But by February of 20—that case, now that I'm peeking at it, one of—everyone, all the evidence said the bolts were being over-torqued. There was no evidence to say the bolts themselves were flawed. But here, it's the opposite. By February of 2020, we know it's BoraCare. We know—who does? Who knows? Lemoyne. Lemoyne knows. Yes. But that's not—Rye's Residential. But that gets back to the—then your whole case turns on imputation. That's right. Well, not the whole case, but at least— Yeah, a lot of it does. It does. And so then I'm still back to the world of once you send it to them, how is it reasonable with sprinklers popping off for you not to follow up for months? Well, but look at the number of leaks. Again, when you're talking about 16 1⁄2 miles— Yeah, but everyone's worried. Everyone is worried about these sprinklers. Well, they want to make certain, but if you have to replace them all. Is it unreasonable? And that's what the jury has to decide. And they could come to that conclusion, but it's—the court— They do all the work to inquire? I mean, everyone's looking, and they finally send it to this expert doctor and lab, but then they just never say, what did you figure out? Well, they're waiting for Lemoyne to report back, and part of it Lemoyne held that. And then ultimately in November of 20, we get the—they said, Lemoyne decides to send additional samples before they're willing to disclose anything. RISE Residential says, here's what's going on. We're waiting on the expert. Okay, wait a minute. RISE did say, hey, what's going on? As far as— Where is that in the record after February? Well, that, Your Honor, I cannot cite. Okay, don't say little things like that. Well, I apologize to the court, but the key is RISE Residential, obviously they're operating—they're waiting on Lemoyne. They had inquired of Lemoyne, right? And they're ultimately waiting for Lemoyne. Is it unreasonable for them to wait till Lemoyne to say, here's the final report? Okay. I mean, that's what it comes down to, Judge Higginson, is the reasonableness. And the district court should have allowed the jury to ultimately have the opportunity to hear it, whether that's unreasonable. Whether that eight months is unreasonable or not. Because of COVID, because they wanted a final report, not an initial one. Okay, I see. I mean, all of that, that's what it turns on. And I think that is fair under summary judgment. If it had been a prescription trial, that would be different. But that's not what happened here. There was not a credibility—there was credibility calls made, which is not appropriate. Your Honor, was it a full trial on prescription? As I understand it, yes, I believe so. Thank you, Your Honor. I'm happy to answer any questions. Thank you, counsel. Thank you. The court will take this matter under advisement. We're going to take a 10-minute recess. We'll recess until 1115. All rise. Thank you.